**Deborah S. WILLIAMS, individually, and on behalf of all other persons similarly situated, Plaintiff-Appellant,**

v.

**COLORADO SPRINGS, COLORADO, SCHOOL DISTRICT # 11, and Colorado Springs Teachers Association, Defendants-Appellees.**

No. 79–1301.

United States Court of Appeals, Tenth Circuit.

Argued July 7, 1980.

Decided Feb. 9, 1981.

Martin A. Mansfield, Jr., Littleton, Colo., for plaintiff-appellant.

R. E. Anderson of Horn, Anderson & Johnson, Colorado Springs, Colo., for defendants-appellees.

Before SETH, Chief Judge, McKAY, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This Title VII race discrimination action was brought under 42 U.S.C. § 2000e et seq., by Deborah Williams on behalf of herself and all other black persons who have been employed as school teachers or who have applied for employment as school teachers in Colorado Springs, Colorado School District # 11. Williams alleges that in violation of Title VII, (1) the District's hiring and assignment practices have resulted in the concentration of black teachers in a few schools within the District and (2) she was denied employment with the District for the school year 1973–74 because of her race. After trial to the court, judgment was rendered in favor of District # 11 on both the individual claim and the class action. We affirm in part and reverse in part.

In July 1970, Williams was hired by the District for the 1970–71 school year to teach fourth grade in Garfield School. Three weeks after she commenced employment with the District, she was reassigned to Roosevelt School due to increased student enrollment there. From the start, Williams experienced difficulty adjusting to Roosevelt. Unlike Garfield, Roosevelt employed a team teaching system, under which four teachers taught a group of approximately 115 students in an open classroom. This system required the teachers to coordinate their efforts closely, and Williams, who was the only black teacher at the school, experienced difficulty collaborating with the other teachers. She testified she was told by a

fellow teacher that she was not wanted at Roosevelt, and that the teachers often failed to include her in planning sessions. Indeed, after her first day at Roosevelt, E. B. Whisenhunt, Roosevelt's white principal, told her that he would never have hired her.

Roughly four months later, Whisenhunt informed Williams that her contract would probably not be renewed for the next year. He told her she was not meeting the District's teaching standards and provided her a written list of deficiencies in her performance. On January 28, 1971, Whisenhunt wrote Williams a letter advising her again that it was doubtful her contract would be renewed. In March, Williams received her official first year evaluations, all of which were poor. The evaluators included Mrs. Arnold, a visiting black supervisor; Mrs. MacMichael, a white supervisor; and Mr. Whisenhunt. All three recommended that her contract not be renewed. Whisenhunt commented:

"I would recommend that she return to school for course work in elementary reading, math, science, social studies, and child development. Ultimately I believe this to be in her best professional interest, and in the educational welfare of her students to be."

Rec., vol. IX, exhibit 21.

When Williams was informed she would not be given a contract for the next year, she decided to pursue a master's degree in teaching at Colorado College. She earned four A's and four B's in graded courses and received her degree on January 28, 1973. She then reapplied for a teaching position with the District for the 1973–74 school year. After interviewing with a number of principals at different elementary schools in the District, she failed to receive an offer of employment.

Shortly thereafter, Williams filed charges with the Colorado Civil Rights Commission and the Equal Employment Opportunity Commission. When the E.E.O.C. dismissed Williams' complaint, she brought this action. The complaint alleges the District unlawfully discriminated against her in refusing to hire her for the 1973–74 school year. It also directly attacks the District's hiring and assignment procedures on behalf of a class of all those black persons who have been adversely affected by such procedures.

Under the District's hiring and assignment system, a school principal is vested with almost complete discretion in hiring teachers for that school. The district court found that

"[w]hile the central administrative personnel office receives the applications for employment and screens them for qualifications, the individual hiring decisions are made by school principals. The principals who make these hiring decisions are free to use individual subjective evaluations of the applicants without being restricted by hiring guidelines other than the necessary teacher certification."

Rec., vol. I, at 38. Mr. Lynn, an administrator in the personnel office, explained the rationale for the District's principal-centered hiring system:

"[The principal] is really closer to the need—our buildings are so different.

"The programs are different. They are in a really better position to know exactly what is needed in a teacher to fill a particular vacancy. They know their program better than we do."

Rec., vol. II, at 193. When asked to specify the major needs to which he was referring, Mr. Lynn testified: "It can be programmed [sic]. It can be personalities. It can be a staff balance, age, sex, race to make up the uniqueness of the building; the income area; the size; many things." Id. at 201.

The District's black teachers are concentrated in schools with a large proportion of black students, particularly those schools with black principals. Statistical evidence was presented ranking the District schools by the cumulative total of full-time black teachers employed per year at each school between 1972 and 1978. It showed that 3 of the 37 elementary schools in the District employed more than 50% of the District's black teachers during this period and 5 of 37 schools employed more than 67%. The evidence also revealed that 17 District ele-

mentary schools did not have a single black teacher between 1972 and 1978. Mr. Larry Osaki, a qualified statistician, concluded that this skewed distribution of black teachers in the District was best explained by the distribution of black students among the various schools in the District. Plaintiff argues that this concentration of black teachers in the few schools with high black student populations demonstrates that the District's hiring practices have had a discriminatory impact on black teachers in violation of 42 U.S.C. § 2000e–2(a)(2), namely, that employment opportunities for black instructors have effectively been limited to those schools with a substantial number of black students.[1]

With respect to the class claim, the trial court held the evidence sufficient to make a prima facie showing that the District's hiring system was unlawful. However, the court found that the District had successfully rebutted the prima facie case by articulating a legitimate, nondiscriminatory reason for its principal-centered hiring practices, *i. e.*, a principal's superior knowledge of the peculiar needs of his own school. The district court also ruled that Williams established a prima facie case of employment discrimination with regard to her individual claim. The court again concluded that the District had rebutted the prima facie showing by articulating a legitimate reason for her nonemployment, *i. e.*, that the principals who had considered her had selected other applicants for nondiscriminatory reasons.

On appeal, Williams contends that (1) the trial court improperly applied the "disparate treatment" standard of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), rather than the "disparate impact" standard of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), in determining whether the District rebutted the prima facie showing on the class claim and (2) the evidence does not support the court's finding that the District's failure to hire Williams for the 1973–74 year was not race-related.

## I.

### The Class Action

Disparate treatment and disparate impact are "alternative theories upon which a right to relief under Title VII may be established in a given case." *Wright v. National Archives & Records Service*, 609 F.2d 702, 711 (4th Cir. 1979) (footnote omitted). Disparate treatment analysis is applied to claims alleging "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). Disparate impact analysis, on the other hand, is applied to claims involving "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* While proof of discriminatory motive is necessary under a disparate treatment theory, such proof is not required under a disparate impact theory. *See id.* Accord, *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 702–03 (8th Cir. 1980). For the latter, it is enough that the employment practices had a discriminatory *effect. Dothard v. Rawlinson*, 433 U.S. 321, 329, 97

---

1. Section 703(a)(2) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(2), provides:

    "(a) It shall be an unlawful employment practice for an employer—
    (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race ...."

If the District's hiring practices confined black applicants for teaching positions to certain schools within the District as plaintiff's evidence suggests, there is no question they violated this provision. The Supreme Court has emphasized that "Title VII provides for equal opportunity to compete for *any* job ...." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 338 n.18, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) (emphasis in original).

S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). As we said in *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 942 (10th Cir. 1979):

"In a Title VII case based on disparate impact, the consequences of the employment practice are prohibited, and good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)."

*See also Muller v. United States Steel Corp.*, 509 F.2d 923, 927 (10th Cir. 1975), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1976); *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 218 (10th Cir. 1972).

The class action in this case is based upon a disparate impact theory. Williams claims that the District's hiring and assignment practices have caused black teachers to be concentrated in a few District schools. The trial court correctly held the evidence established a prima facie case of a Title VII violation. Here, as in *Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 635 (4th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979):

"We need not inquire whether this burden was satisfied solely by the statistical evidence of the significant disadvantages

under which the plaintiff class laboured, since where, as here, such proof is coupled with evidence that defendant based hiring and other employment decisions upon the subjective opinions of white [superiors], the trial court is entitled to infer, as it did here, that the defendant illegally discriminated . . . ."

*See also James v. Stockham Valves & Fitting Co.*, 559 F.2d 310, 330 (5th Cir.), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1977); *United States v. N. L. Industries, Inc.*, 479 F.2d 354, 368 (8th Cir. 1973). District # 11 does not challenge the trial court's finding of a prima facie case.

Once the plaintiff establishes a prima facie case of discriminatory impact, "the employer must meet 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.'" *Dothard*, 433 U.S. at 329, 97 S.Ct. at 1851 (quoting *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854). "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853. *Accord, United States v. Lee Way*, 625 F.2d at 941; *Spurlock*, 475 F.2d at 218 ("[P]re-employment qualifications which result in discrimination may be valid if they are shown to be job-related.")[2] The

**2.** As have other courts, we have spoken of business necessity in terms of a "showing that the maintenance of safety and efficiency requires the practice," *Muller*, 509 F.2d at 928, in situations in which safety and efficiency are the relevant concerns. *See, e. g., Watkins v. Scott Paper*, 530 F.2d 1159, 1171 n. 15 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); *N. L. Industries*, 479 F.2d at 365; *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 249 (10th Cir. 1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1970). The job-relatedness and the safety and efficiency standards are simply different sides of the same coin. *See de Lavrier v. San Diego Unified School Dist.*, 588 F.2d 674, 678 (9th Cir. 1978). Job-relatedness as used by the Supreme Court in *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853, requires that hiring and promotion criteria be necessary to the effective performance of a job. The safety and efficien-

cy standard requires that an employment practice be necessary to the efficient operation of an enterprise or to its safety. The Supreme Court has, in fact, indicated that the two terms are interchangeable. In *Albemarle Paper Co. v. Moody*, the Court stated that if the employer shows that "its tests are *'job related,'* it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in '*efficient and trustworthy workmanship.*'" 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)) (emphasis added). And in *Dothard v. Rawlinson*, 433 U.S. 321, 331 & n.14, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977), the Court stated in reference to the job-relatedness standard that "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive

term "necessity" connotes that the exclusionary practice must be shown to be of great importance to job performance to rebut a prima facie case. *Accord, United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971). A showing of "mere rationality" is not adequate. *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 249 (10th Cir.), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1970). Nor is it sufficient that "legitimate management functions" are served by the employment practice. *See Muller*, 509 F.2d at 928.

"[T]he business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." [3]

*Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.) (footnotes omitted), *cert. denied*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

Williams contends the district court failed to apply these standards for discriminatory impact cases in dismissing the class action. We agree. Instead, it appears the court applied the standards for evaluating "dispa-

rate treatment" claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1977). After finding that the class had made a prima facie showing, the court said that the District need only articulate a legitimate, nondiscriminatory reason for its hiring system to rebut the class case. The District was held to have met this requirement by presenting evidence that its principal-centered hiring system allowed it to accommodate the particular needs of each individual school. The court then stated that "[i]n the absence of proof of purposeful discrimination, a violation of Title VII could be found in this case only if that rationale of the employment procedure can be characterized as pretextual. That has not been shown." [4] Rec., vol. I, at 40. This statement sets forth the shifting burdens in a "disparate treatment" case in language almost identical to that in *McDonnell Douglas, see* 411 U.S. at 802–04, 93 S.Ct. at 1824, and *Furnco, see* 438 U.S. at 578, 98 S.Ct. at 2950.

■ What must be done to rebut a prima facie showing in a disparate treatment case is significantly different from a sufficient rebuttal in a disparate impact case. *See Kirby*, 613 F.2d at 702–04. As

---

a Title VII challenge." As it has worked out in the lower courts, the job-relatedness language is usually applied to testing and academic requirements, while the safety and efficiency language is generally applied to other employment practices. *See generally Annot.*, 36 A.L.R. Fed. 9, 26 (1978).

3. Whether the business purpose can be "served by a reasonably available alternative method having less discriminatory effects," *see Muller*, 509 F.2d at 928, is particularly pertinent to this case. We note that defense witness Robert Lynn, Administrative Assistant in Personal Services for the District, indicated during cross-examination that a reasonable alternative to the District's principal-centered hiring system may exist. He testified that on at least one occasion during the 1977–78 period, the District's personnel office had composed a list of eight minority applicants and limited the principal's hiring options to one of the persons on the list. Since the District continued to adhere to its belief in the value of significant principal

control in hiring teachers, this method apparently met that goal. It did provide the principal substantial discretion in selecting who would be hired. Yet at the same time, it satisfied other concerns, such as assuring minority representation, and limited the degree to which a principal's racial prejudice could affect the racial balance of the District's faculty.

That District # 11 may have later adopted such a system and may now have higher minority representation is, of course, irrelevant to whether the District earlier violated Title VII. As we stated in *Jones v. Lee Way*, 431 F.2d at 248, "[t]he company's claimed recent efforts to recruit [Blacks] do not change the situation, because our concern is with the employment practices at the time when the plaintiffs were hired." *Accord, Teamsters*, 431 U.S. at 341–42, 97 S.Ct. at 1857.

4. We have already pointed out that proof of *purposeful* discrimination is not necessary in a disparate impact case. *See* page 8 *supra*.

the trial court stated, under the disparate treatment theory all the defendant need do is *articulate* a legitimate, nondiscriminatory reason for the practice in order to rebut the inference of intent. The employer carries a burden of production. *Wright v. National Archives & Records Service*, 609 F.2d 702, 713 (4th Cir. 1970). *See Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 297, 58 L.Ed.2d 216 (1978). The " 'employer's burden is satisfied if he simply explains what he has done' or 'produce[s] evidence of legitimate nondiscriminatory reasons.' " *Id.* (quoting dissenting opinion at 28, 29). In a disparate impact case, on the other hand, we have said that the employer must *prove* business necessity for the challenged practice to rebut the prima facie case. *EEOC v. Navajo Refining Co.*, 593 F.2d 988, 990 (10th Cir. 1979). He bears a burden of proof. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) ("burden of proving" tests are "job related."); *Harless v. Duck*, 619 F.2d 611, 616 (6th Cir. 1980); *Ramirez v. Hofheinz*, 619 F.2d 442, 446 (5th Cir. 1980); *Kirby*, 613 F.2d at 703. Moreover, in a disparate impact case, unlike a disparate treatment case, a rational or legitimate, nondiscriminatory reason is insufficient. The practice must be essential, the purpose compelling. See pages 10–11 *supra.*

■ In light of the district court's misapplication of "disparate treatment" standards to this "disparate impact" claim, we reverse and remand the class action for further consideration consistent with this opinion. We express no view on whether the District's evidence was sufficient to rebut the prima facie case of the class under the more exacting "business necessity" standard established in *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853, and its progeny. We note, however, that the question whether hiring and promotion procedures that rely heavily on subjective determinations are justified by business necessity has been of great concern to courts and commentators.

*See, e. g., Rogers v. International Paper Co.*, 510 F.2d 1340 (8th Cir. 1975), *vacated*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Muller*, 509 F.2d 923; *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); Stacy, *Subjective Criteria in Employment Decisions Under Title VII*, 10 Ga. L.Rev. 737 (1976); Note, *Title VII and Employment Discrimination in "Upper Level" Jobs*, 73 Colum.L.Rev. 1614 (1973).

In *Muller*, we declared our concern with the defendant's "lack of meaningful standards to guide the promotion decision, whereby there is some assurance of objectivity. Such personal and subjective criteria encourage and foster discrimination." 509 F.2d at 927–28. We went on to state that where "the results give a strong indication that discrimination is being practiced, the cases condemn subjective standards . . . ." *Id.* at 928. As the court pointed out in *Rogers v. International Paper Co.*, 510 F.2d at 1345:

> "Greater possibilities for abuse . . . are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus, it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definition of employment criteria."

*See also Barnett v. W. T. Grant Co.*, 518 F.2d 543, 550 (4th Cir. 1975), ("Nonobjective hiring standards are always suspect because of their capacity for masking racial basis [*sic*].")

■ On remand, it is incumbent upon the trial court to carefully weigh the evidence presented by the District in determining if the District's hiring and promotion procedures are justified under the business necessity standard.[5]

---

**5.** In *United States v. Hazelwood School Dist.*, 534 F.2d 805 (8th Cir. 1976), *rev'd on other grounds*, 431 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Eighth Circuit invalidated a principal-centered hiring system strikingly similar to that of the present case. On the

## II.

### The Individual Claim

Williams also challenges the trial court's finding that the District's failure to hire her for the 1973–74 school year did not constitute discriminatory treatment. As indicated earlier, in *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, the Supreme Court set forth a three-step analysis for evaluating a claim of "disparate treatment" under Title VII. *See also Furnco*, 438 U.S. 567, 98 S.Ct. at 2944. First, the plaintiff must establish a prima facie case of discrimination by showing (1) that he belongs to a protected class; (2) that he applied and was qualified for the job, (3) that he was nevertheless rejected; and (4) that after his rejection the position remained open and the employer continued to seek applicants with similar qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Ray v. Safeway Stores, Inc.*, 614 F.2d 729, 730 (10th Cir. 1980). Where a prima facie case is established, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the plaintiff's rejection. *Furnco*, 438 U.S. at 578, 98 S.Ct. at 2950. *See also Safeway Stores, Inc.*, 614 F.2d at 731. If the employer satisfies this burden, the plaintiff must prove that the reason offered by the employer for his discharge was merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1825. *Furnco*, 438 U.S. at 578, 98 S.Ct. at 2950.

The trial court held the District successfully rebutted Williams' showing of a prima facie case with evidence that the school principals who interviewed her for a position had legitimate reasons for not selecting her, and that she failed to demonstrate these reasons were merely a pretext for discrimination. We must uphold the trial court's findings unless they are clearly erroneous. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct.

1562, 1576, 23 L.Ed.2d 129 (1969); *United States v. United Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). In order to conclude that findings are clearly erroneous, we must be definitely and firmly convinced, after reviewing the record as a whole, that a mistake has been made. *Id.* Under this standard, we are compelled to affirm the trial court's findings.

The District presented evidence that Williams received extremely poor evaluations from all of her supervisors during the 1970–71 school year. Mrs. Arnold, a black supervisor in the District who had evaluated Williams in 1971, informed one of the principals interviewing Williams in 1973 that she had "deep concerns" about Williams' reemployment with the District. That principal selected a different applicant who had also taught in the District but who had good references. Another principal who interviewed Williams for a first grade position stated that he selected instead an applicant who had been teaching first grade in another District school. He testified that this applicant, who was applying for a transfer within the District, had to be placed in one of the District's schools, and since she was at least as well qualified as the other applicants, he selected her. A third principal testified that he selected an applicant whom he felt would be "open to suggestions, very willing to work with other people, just very congenial" rather than Williams whom he characterized as "rather brusk, and rather overbearing" in the interview. Rec., vol. VI, at 5.

In view of this evidence, we cannot say the trial court's finding that the District articulated legitimate, nondiscriminatory reasons for Williams' rejection was clearly erroneous. Nor under the strict standard for reviewing factual findings can we say that the trial court was clearly erroneous in finding that those reasons were not merely pretexts for discrimination.

basis of statistical evidence, the court found that the hiring system had a discriminatory impact on Blacks and concluded that the school district had failed to rebut the inference of discrimination thereby established. Without

commenting on the school district's subjectively-based hiring practices, the Supreme Court reversed on the ground that the Eighth Circuit improperly analyzed the statistical evidence.

The judgment below is reversed insofar as it dismisses the class action, and the case is remanded for further proceedings consistent with this opinion. The judgment in favor of defendants on Williams' individual claim is affirmed.