**Kathleen G. DEAVENPORT, Plaintiff,**

v.

**MCI TELECOMMUNICATIONS CORPORATION,**
**Defendant.**

**Civil Action No. 96–B–002.**

United States District Court,
D. Colorado.

Aug. 13, 1997.

---

▮▮▮▮▮▮▮▮▮▮

Richard P. Ranson, Colorado Springs, CO, Frank N. Dubofsky, Frank N. Dubofsky, P.C., Boulder, CO, for Plaintiff.

Edwin P. Aro, Holme, Roberts & Owen, L.L.C., Denver, CO, for Defendant.

## MEMORANDUM OPINION & ORDER

BABCOCK, District Judge.

Defendant, MCI Telecommunications Corporation (MCI), moves for partial summary judgment on plaintiff's claim that MCI retaliated against her for complaining of sexual harassment and on her claim for back pay damages. MCI argues that plaintiff, Kathleen G. Deavenport (Deavenport), cannot maintain a retaliation claim because none of the allegedly retaliatory acts of which she complains constitute an "ultimate employment decision." MCI further argues that Deavenport cannot recover back pay for any of her claims because she has been on disability leave and unable to work for the past two and one-half years. The motion is adequately briefed, and oral argument would not aid me materially in deciding it. For the following reasons, I will deny defendant's motion.

### I.

The following facts are undisputed or, if disputed, are viewed in a light most favorable to Deavenport. Deavenport began working for MCI as a Senior Engineer in 1992. She was promoted to Senior Engineer II in 1993, and she received high performance ratings from MCI in 1993 and 1994. Her last official evaluation in May 1994 was described by her manager as the highest performance evaluation he had ever made. Pltf. Exh. 2. Deavenport was treated as a manager and included in management-level discussions and meetings even though she was not a manager.

Early in her career at MCI, Deavenport was assigned to work for a manager named Rick Pierson. Soon thereafter, she was approached by Pierson and asked to go out with him and to discuss intimate details of his sex life. She objected to his conduct, and

MCI reassigned Deavenport to work for another manager, Dick Stephens. Stephens criticized Deavenport for making complaints about Pierson and told her to be more supportive of him. Pltf. Exh. 9, p. 63. Stephens also made occasionally crude remarks and told off-color jokes. In addition, Stephens had several postcards of nude and nearly nude women he kept in his desk. He showed these postcards to Deavenport in the context of questioning how women with large breasts could engage in athletic activities and whether all the men watching would have erections. Pltf. Exh. 1, ¶ 12.

Deavenport complained to Stephens about his conduct, and he told her she was a business and sexual prude. *Id.* at ¶ 13. Beginning in the spring and summer of 1993 and thereafter, Stephens referred to Deavenport in front of her coworkers as a "cold hearted bitch," "bitch," "the wicked witch of the west," and a "black widow spider that would eat her mate." *Id.* at ¶ 16.

After a departmental reorganization, Steve Hanley became Deavenport's supervisor. After July 1, 1994, Hanley repeatedly spoke to Deavenport about his sex life and arousal by female co-workers. Other women observed Hanley howling at women and commenting on their physical appearance after they walked past him. Pltf. Exh. 10 pp. 19,85–86. Deavenport complained about Hanley's conduct to Michael McShane, the director of Deavenport's department and Hanley's superior. Hanley's conduct continued after Deavenport's complaints. *Id.* at ¶ 19. After speaking with McShane on August 12, 1994, Hanley began to keep a log of events he titled "Notes related to Sexual Harassment Claims and Genelle Deavenport." Pltf. Exh. 14.

On August 22, 1994, Deavenport participated in a management planning meeting with senior managers in her department, including Stephens, McShane, and Hanley. She was the only female in attendance. In response to her request for additional staffing and equipment to complete her project, at least two male managers told her in the open meeting that she should go stand on the corner and use her feminine wiles. Pltf. Exh. 14, 8/22 entry.

At an "open door" meeting on September 6, 1994, attended by Deavenport, Don Clow, Randy Buck, McShane, and Hanley, Deavenport expressed her dissatisfaction with Hanley and told him that she would rather transfer her team back to Stephens than continue to work for him. Pltf. Exh. 14, 9/6 entry. Stephens later told Hanley that he would never take Deavenport back. *Id.*, 9/7 entry.

On September 28, McShane, Hanley, Louis Mosely from Human Resources, and Stephens met to discuss Deavenport's complaints of sexual harassment. Stephens prepared a "Memorandum for the Record" of the meeting, and stated that he wanted all complaints about him by Deavenport stopped. Pltf. Exh. 19. It does not appear, however, that any investigation by Human Resources was ever conducted into Deavenport's complaints of sexual harassment. Pltf. Exh. 17, p. 35; Pltf. Exh. 20, pp. 3944.

On October 5, 1994, Hanley sent Deavenport a memorandum stating, in part, that her complaints of harassment were disruptive and inappropriate and that if they did not stop, she could be terminated. Pltf. Exh. 22. The memorandum did state, however, that if she had any complaints she felt were unresolved, to let the human resources department know so that they could investigate. Id. Later that day, Hanley ordered Deavenport to put all of her complaints in writing by October 6, 1994. She did so in an e-mail sent directly to McShane. She met with McShane that day to discuss her complaints. He told her that her complaints about Stephens and Hanley were "insubordination," and that if she could not work in her existing environment, she should resign. Pltf. Exh. 1, ¶ 33.

Within four days of her meeting with McShane, Hanley told Deavenport that some of her job duties and responsibilities would be reassigned to other people, and another job would be found for her. Pltf. Exh. 24, p. 37. Her job as chief engineer and architect of a security system was immediately taken from her. Ptf. Exh. 26. By the end of October, Deavenport had only administrative duties. Pltf. Exh. 1, ¶ 35. In December, Deavenport was reassigned to work with Stephens, who had transferred to Washington, D.C. The reassignment required extensive travel to Washington, D.C. In addition, Hanley told Deavenport that she was then over-paid for her job duties, and she should expect to be laid off. Pltf. Exh. 1, ¶ 36.

While working in D.C. with Stephens, he told Deavenport that her career at MCI was over because she had complained about him. In late January 1995, while both were staying at the same hotel, Stephens threw ice cubes at Deavenport from several floors above. Pltf. Exh. 1, ¶¶ 37–39. Within two weeks after the ice-throwing incident, Deavenport went on medical leave because of her deteriorating emotional state. She remains on medical leave to present.

### II.

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53.

### III.

MCI seeks summary judgment on (1) Deavenport's claim for retaliation and (2) Deavenport's demand for back pay damages. I will address each argument in turn.

### A. *Retaliation Claim*

■ Plaintiff asserts a claim for retaliatory discrimination under 42 U.S.C. § 2000e–3(a), which provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The three step paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411·U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) applies to retaliation claims under 42 U.S.C. § 2000e–3(a). *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir. 1984). The plaintiff must first establish a prima facie case of retaliation by showing: "(1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action." *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir.1996). Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a nondiscriminatory reason for the challenged action. If the defendant meets its burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is pretextual.

MCI argues that Deavenport cannot maintain an action for retaliation under Title VII because she cannot establish the second element of her prima facie case: adverse action by MCI subsequent to or contemporaneous with her complaints of sexual harassment. Specifically, MCI argues that Deavenport has not alleged any retaliatory incident comprising an "ultimate employment decision." MCI contends that a Title VII retaliation claim must be based upon adverse action that is an "ultimate employment decision," such as termination or demotion, to be actionable. I disagree.

In *Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir.1997), *cert. pending*, 66 U.S.L.W. 3108 (July 21, 1997), the court held that the plaintiff could not maintain her claim against Kodak for retaliation based upon allegations of: hostility from fellow employees, theft of her tools, visit by supervisor to plaintiff's home, verbal threat of termination, reprimand for not being at her assigned station, and placing plaintiff on "final warning." The court stated that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Id.* at 707 (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)). "Ultimate employment decisions," stated the court, are acts "such as hiring, granting leave, discharging, promoting, and compensating." *Id.*

The Tenth Circuit, however, has not adopted the *Mattern* standard. In fact, the Tenth Circuit has liberally construed Title VII to effectuate its remedial purpose. For example, in *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir.1996), the court interpreted the word "employees" in § 2000e–3 to include former, as well as current, employees. In doing so, the court "eschewed a literal reading of the section in favor of a reading that comported with the broad, remedial goals of Title VII." *Id.* at (quoting *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1165 (10th Cir.1977)). "A statute which is remedial in nature should be liberally construed." *Id.* at 986.

Given the Tenth Circuit's liberal reading of Title VII, it is unlikely that it would agree with the Fifth Circuit that retaliation claims must be based upon an ultimate employment decision. To the contrary, although not addressing the issue specifically, the court has repeatedly permitted claims for retaliation based upon less than an "ultimate employment decision" as defined in *Mattern*. *See, e.g., Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir.1993) (stating that transfer or reassignment of duties constitutes impermissible retaliation); *Rutherford, supra* (holding that a negative reference by an employer who had previously given a positive reference constitutes impermissible retaliation); *see also McKenzie v. Atlantic Richfield Co.*, 906 F.Supp. 572, 575 (D.Colo.1995); *Passer v. American Chemical Society*, 935 F.2d 322, 330–31 (D.C.Cir.1991).

Nevertheless, the Tenth Circuit has not addressed directly the scope of adverse actions by employers that may serve as the basis for a retaliation claim. Therefore, I will consider the reasoning of *Mattern*, which I conclude is unconvincing. *Mattern* relies mainly on two premises: (1) stare decisis from the previous Fifth Circuit case of *Dollis, supra;* and (2) statutory analysis of

§§ 2000e–2 and 2000e–3. Neither provides a convincing basis for the court's decision in *Mattern,* and I decline to follow it.

First, I am not constrained by *Dollis* because it is not binding on this court. More importantly, *Dollis* is inapposite. There, the plaintiff asserted a claim under 42 U.S.C. § 2000e–16, which applies only to government employees and states: "All personnel actions affecting employees ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." The court interpreted "personnel actions" to include only "ultimate employment decisions." *Dollis,* 77 F.3d at 781–82 (relying on *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981) (another § 2000e–16 case)). By contrast, § 2000e–3(a) states only that an employer shall not "discriminate" against an employee who engages in protected activity and mentions nothing as specific as "personnel actions." Therefore, I question whether the *Mattern* court was bound to follow the *Dollis* analysis because it interpreted a different, more specific section of Title VII, and it is irrelevant here.

I am also not persuaded by *Mattern's* statutory analysis. According to the court in *Mattern,* the term "discriminate" as used in § 2000e–3(a) is narrow in scope. 104 F.3d at 708–709. The court first looked to § 2000e–2(a)(1) for guidance in defining "discriminate." Section 2000e–2(a)(1) provides:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

The court then compared § 2000e–2(a)(1) to § 2000e–2(a)(2), which provides that it shall be an unlawful employment practice for an employer

to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Through this comparison, the court construed the term "discriminate" as being narrowly limited to taking adverse ultimate employment actions, such as discharge, demotion, failure to promote, etc. The court reasoned that the language in § 2000e–2(a)(2), which did not use the word "discriminate," was broader in scope than that used in § 2000e–2(a)(1), which does employ the word "discriminate." *Mattern, supra* at 708–09.

*Mattern* states that § 2000e–2(a)(1)'s prohibition of discrimination based on compensation, terms, conditions, or privileges of employment

contrasts sharply with the more vague proscription found in [§ 2000e–2(a)(2) ], of "limitation" of employees which deprive or "would tend to deprive" the employee of "opportunities" or "adversely affect his status." It goes without saying that this second subpart reaches much farther than the first. It reaches acts which merely "would tend" to affect the employee; obviously, the way in which the employee may be affected in this subpart is much broader.

*Id.* at 709. (citations omitted). The court then summarily concluded: "The anti-retaliation provision speaks only of 'discrimination'; there is no mention of the vague harms contemplated in § 2000e–2(a)(2). Therefore, this provision can only be read to exclude such vague harms, and to include only ultimate employment decisions." *Id.*

At most, *Mattern's* analysis leads to the conclusion that a plaintiff asserting a claim under § 2000e–2(a)(1) must show actual harm and an intent to discriminate while § 2000e–2(a)(2) plaintiffs can maintain a claim based on a practice that has a "tendency" to harm individuals in certain classes regardless of the defendant's intent. In particular, § 2000e–2(a)(2) permits "disparate impact" claims, which do not depend upon a showing of intentional discrimination, as opposed to disparate treatment or harassment claims, which require a showing of intent to discriminate. *See Livingston v. Roadway Express, Inc.,* 802 F.2d 1250, 1251 (10th Cir. 1986); *Williams v. Colorado Springs, Colorado, School District No. 11,* 641 F.2d 835,

838 (10th Cir.1981); *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 668 (7th Cir. 1996); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1484 (9th Cir.1993), *cert. denied*, 512 U.S. 1228, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). Therefore, the relevant distinction to be gleaned from a comparison of §§ 2000e–2(a)(1) and 2000e–2(a)(2) is that the term "discriminate" connotes an intention to single-out an individual or group, not that it requires an "ultimate employment decision" to be actionable.

I agree that § 2000e–2(a)(1) should be used to interpret the word "discriminate" in § 2000e–3(a). Properly read, however, § 2000e–2(a)(1) defines the word "discriminate" to include failing to hire, terminating, *or otherwise discriminating* against any individual as to the compensation, *terms, conditions, or privileges* of employment. Clearly, given the plain language of the statute, "discrimination" includes more than just failing to hire, terminating or making other "ultimate employment decisions."

Section 2000e–2(a)(1) does not prohibit all employment discrimination. Rather, actions under § 2000e–2(a)(1) are limited, however slightly, to discrimination with respect to the compensation, terms, conditions, and privileges of employment. Nevertheless, in its own right, § 2000e–2(a)(1) permits an action based upon a wide variety of acts constituting discrimination, including both "disparate treatment" and "hostile work environment" claims. *Mattern* appears to be based, in part, upon the notion that even disparate treatment claims under § 2000e–2(a)(1) must be based upon "ultimate employment decisions." *See Mattern, supra* at 708 and cases cited therein. The Fifth Circuit's "ultimate employment decisions" rule, however, appears to contradict the language of the statute, which permits an action based solely on discrimination with respect to the terms or conditions of employment, and I am not persuaded such a rule applies in this circuit. *See Torre v. Federated Mutual Insurance Co.*, 897 F.Supp. 1332, 1370–80 (D.Kan.1995) (recognizing claims under § 2000e–2(a) and 2000e–3(a) for discrimination in terms and conditions of employment). Moreover, whatever the limits to actionable discrimination under § 2000e–2(a)(1), § 2000e–3(a) is broader.

Section 2000e–3(a) does not limit the basis of actionable discrimination. It states simply that an employer may not "discriminate" against an employee because of that employee's protected activity under Title VII. Therefore, even § 2000e–2(a)(1)'s slight limitation to compensation, terms, conditions, and privileges of employment is absent from § 2000e–3(a).

Indeed, construction of § 2000e–3(a)'s prohibition against retaliation as broader than the prohibitions of § 2000e–2(a) is wholly consistent with, and furthers the remedial purpose of, Title VII. Section 2000e–3 may well be considered *sui generis* because it acts not only to remedy illegal and unfair discrimination, but also to provide protection to those wishing to enforce their rights under other sections of Title VII. Were some discriminatory acts that had a real and negative effect on a person who brings a charge of discrimination under § 2000e–2(a) permitted, it would have a chilling effect upon employees' willingness to make charges or support others' charges under that section. Title VII is remedial, and, according to the Tenth Circuit, it should be interpreted broadly in light of congressional intent. Congress plainly intended to protect those bringing good faith claims under § 2000e–2, and this protection extends to those whose claims may ultimately be unfounded. Permitting any negative action by an employer towards a person bringing such a claim will be a disincentive to others bringing claims in the future. That cannot be what Congress intended.

Nor am I convinced that such a broad reading of § 2000e–3 opens the door to myriad claims for "minor" retaliations. Such actions will be self-limiting in that if retaliations are so minor that they have no real effect on the plaintiff's emotional state or employment status or conditions, there will be no damages making assertion of a retaliation claim worthwhile.

■ However, claims under § 2000e–3(a) are not boundless. According to § 2000e–3(a), a claim for retaliation must arise from an "employment practice." Section 2000e–2(a) contains the same prefatory language. In both sections, this language connotes that a retaliation claim must be based upon ac-

tions of the employer, and those actions must relate to the plaintiff's employment.

Obviously, employment-related decisions made directly by the employer constitute actions that can serve as the basis for a retaliation claim. Such retaliation claims are analogous to disparate treatment claims under § 2000e–2(a)(1) and can be based upon decisions such as "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period." *McKenzie, supra* at 575 (quoting *Cooper v. Cobe Labs., Inc.*, 743 F.Supp. 1422, 1433 (D.Colo.1990)). In addition, under certain circumstances, an employer can be liable for the retaliatory acts of its employees:

> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relationship.

*Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 783 (10th Cir.1995).

■ Thus, to prove a prima facie case for retaliation under § 2000e–3(a), a plaintiff must show: (1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) an adverse employment-related action by the employer occurring subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the adverse action.

■ Based upon the record before me, which I must view in a light most favorable to Deavenport, genuine issues of material fact preclude summary judgment on her claim for retaliation. Deavenport has presented evidence of several actions by MCI she claims to be adverse and causally related to her prior complaints of sexual harassment. For example, Deavenport contends that MCI took away several of her major work assignments and forced her to travel extensively to Washington, D.C., after she complained of sexual harassment by Rick Pierson and Dick

Stephens. These decisions by MCI were, arguably, both adverse and employment-related. As discussed, such actions are sufficient to support the "adverse action" prong of a retaliation claim. MCI does not challenge the other two prongs of Deavenport's prima facie case. Accordingly, I will deny summary judgment on Deavenport's retaliation claim.

### B. *Back Pay*

■ Deavenport has been on a disability leave of absence since January 1995. MCI argues that Deavenport is thus not entitled to back pay damages because she was not "ready, willing, and available" for employment as required by the Tenth Circuit. *See Taylor v. Safeway Stores*, 524 F.2d 263, 267–68 (10th Cir.1975). The Tenth Circuit has recognized an exception to this rule, however, where the plaintiff is disabled and the employer caused the disability. *Whatley v. Skaggs Co.*, 707 F.2d 1129, 1138 (10th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983). In *Whatley*, the district court awarded back pay during a period of disability found to have been caused by the defendant's conduct, and the Tenth Circuit held that the award was not an abuse of discretion.

MCI argues that *Whatley* is inapposite because it was decided prior to the 1991 amendments to Title VII. MCI cites, instead, to *Brodie v. General Chemical Corp.*, 1996 U.S.App. LEXIS 418, 1996 WL 11838, slip op. at 3 (10th Cir. Jan. 12, 1996). There, the trial court instructed the jury that "if you find that any of the plaintiffs was physically unable to work for any period of time subsequent to the cessation of their employment with the defendant, that plaintiff is not entitled to receive any back pay or benefits for that period." MCI argues that this represents the Tenth Circuit's view on this issue after the 1991 amendments to Title VII, which, it contends, transform back pay into legal, as opposed to equitable, damages. I am not persuaded.

■ First, there was no objection to the instruction given in *Brodie*, so the Tenth Circuit had no occasion to examine its accuracy. Second, I disagree that the 1991

amendments to Title VII have transformed back pay into a form of legal and not equitable relief. Prior to the Civil Rights Act of 1991, back pay was considered a form of equitable relief in Title VII cases. *See Skinner v. Total Petroleum, Inc.,* 859 F.2d 1439, 1443 (10th Cir.1988). The 1991 amendments provide for compensatory and punitive damages, and state that if the plaintiff is seeking compensatory or punitive damages, either party may request a jury trial. 42 U.S.C. § 1981a(a)(1),(c)(1). Back pay, however, is specifically excluded from the definition of compensatory damages. 42 U.S.C. § 1981a(b)(2). Therefore, back pay remains an equitable remedy that is determined by the court. *See Taylor v. Gilbert & Bennett,* 1997 WL 30948 *4 (N.D.Ill.1997); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 606 (D.Me.1994); *Landgraf v. USI Film Products,* 511 U.S. 244, 251–55 n. 4, 114 S.Ct. 1483, 1490–91 & n. 4, 128 L.Ed.2d 229 (1994); Sand, Siffert, Reiss, & Batterman, *Modern Federal Jury Instructions,* ¶ 88.04 at 88–218 (1996).

Accordingly, pursuant to Whatley, I have discretion to award back pay as an equitable remedy in spite of Deavenport's disability, if she shows that her disability was caused by MCI. MCI has not raised the issue in its motion whether plaintiff's disability was caused by actions of MCI. Therefore, summary judgment is inappropriate.

Accordingly, it is ORDERED that:

1. MCI's motion for partial summary judgment is DENIED.